No.: 3:18-MJ-2134

FILED

SEP 18 2018

Clerk, U. S. District Court
Eastern District of Tennessee
Knoxville

# AFFIDAVIT IN SUPPORT OF APPLICATION

## INTRODUCTION

I, Task Force Officer Zachary S. Standefer, being duly sworn, depose and state as follows:

1. I am a deputized Task Force Officer with the Drug Enforcement Administration (DEA), United States Department of Justice, and have been since December 2014. Prior to this assignment, I worked as an agent with the Tennessee 7th Judicial District Crime Task Force (7th JCTF) from November 2012 until December 2014. I am employed by the Oak Ridge, Tennessee Police Department (ORPD) as a narcotics investigator and have been employed by ORPD for a total of six years. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and I am empowered by law to conduct investigations, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I am currently assigned to the DEA Knoxville Resident Office. I have extensive training and experience in conducting investigations of criminal activity, including; debriefing confidential sources (CSs) regarding known criminal activity, conducting surveillance of persons involved in criminal activity, and conducting searches for evidence to verify suspicion of criminal activity. Criminal activity of specific interest to the DEA includes trafficking of controlled substances. I have experience assisting in the implementation of court-authorized wiretaps for investigative purposes and I am familiar with the terminology and methods of operation used by persons involved in illegal drug distribution activities. In the performance of my duties as both a DEA Task Force Officer and law enforcement officer, I have conducted

1

investigations involving narcotics, drug trafficking, and other criminal investigations throughout the past six years that involve violations of state and federal laws. I have been involved in the detection and investigation of federal narcotics violations, including the sale, distribution, possession, and conspiracy to possess or sell and distribute various narcotics and controlled substances, the use of communication facilities such as telephones, cellular telephones, and other relevant avenues that are commonly used to facilitate narcotics violations. I have received training in a variety of criminal enforcement methods including, but not limited to narcotics enforcement efforts, case development, procedures, investigative techniques, interdiction techniques, asset forfeiture investigations, and other standardized methods of investigation of narcotics offenses. I have received this and other training courtesy of DEA, Appalachia High Intensity Drug Trafficking Area (HIDTA), Walters State Community College, and local agencies such as the 7th JCTF and the ORPD. Investigating numerous violations of state and federal narcotics laws over the past six years in the Eastern District of Tennessee (EDTN), I have been successful in the arrests and convictions of numerous individuals associated with the distribution of narcotics. As a result of these investigations and prosecutions, I have become familiar with the various methods and techniques utilized in the sale and distribution of various controlled substances by individuals within the EDTN and elsewhere. I have become familiar with numerous codes, slang terms, and related terminology employed by individuals within the EDTN to refer to controlled substances, such as heroin and crystal methamphetamine. I have kept abreast of various narcotics violators and have corroborated intelligence regarding narcotics violations from agents of the DEA, Tennessee Bureau of Investigation (TBI), 7th JCTF, and other local law enforcement authorities located in the EDTN and surrounding areas.

3. Based on all of my experience investigating the trafficking of controlled substances, to include heroin, methamphetamine, cocaine, prescription narcotics and marijuana, as well as from reading reports made available by other law enforcement officers and agencies, I have learned that:

 a. Narcotics traffickers often place assets, including accounts at financial institutions, in names other than their own to avoid the detection of these assets by the government or other law enforcement agencies. Even though these assets are in other persons' names, the drug dealers continue to use these assets and exercise dominion and control over them;

 b. Large-scale narcotics traffickers often maintain large amounts of United States currency on hand to maintain and finance their on-going narcotics business;

 c. Narcotics traffickers commonly maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts, photographs, and other papers relating to the transportation, ordering, sale and distribution of controlled substances;

 d. Narcotics traffickers commonly "front" controlled substances to their customers for little to no money at first, with the expectation of being paid for them later; and that the aforementioned items in paragraph "c" are maintained by suppliers of illegal drugs so they can account for their drugs, account for the money owed for these drugs, and account for customers and others, who have possession of, or owe money for these drugs;

 e. It is common for large-scale narcotics traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations both within and outside their residences and businesses, to conceal them from other drug traffickers and law enforcement authorities;

3

f. Persons involved in large-scale narcotics trafficking often conceal in their residences, businesses, safe deposit boxes, safes, vaults, obscure locations, and vehicles, the following: stashes of drugs, large amounts of currency, financial instruments, and other items of value representing the proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from illegal narcotic trafficking activities;

g. When narcotics traffickers collect proceeds from the sale of drugs, they often attempt to legitimize these profits and make them appear to have come from legal sources. To accomplish this goal, drug traffickers often use foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, brokerage houses, trusts, partnerships, shell corporations and business fronts;

h. Narcotics traffickers commonly maintain addresses or telephone numbers in books or papers which reflect the names, addresses, and telephone numbers for their associates in the drug trafficking organization;

i. Narcotics traffickers take, or have in their possession photographs of themselves, their associates, their properties, and their products;

j. Narcotics traffickers usually keep paraphernalia for cutting, packaging, weighing and distributing their drugs. This paraphernalia includes but is not limited to, scales, packaging material, adulterants, and plastic bags; and

k. Persons involved in illegal narcotics trafficking routinely use radio scanners to monitor the activities of law enforcement agencies in order to protect themselves from law enforcement. These persons also routinely use two-way radios to communicate with other traffickers as drugs are being moved from point to point.

4. On the basis of the entire contents of this Affidavit, I believe there is probable cause for the issuance of a search warrant for the property described herein and in Attachment A, and for the purpose of seizure of physical evidence, as set forth in Attachment B.

5. This Affidavit is submitted in support of an application for an order authorizing the search of an American Security Products safe, identification number 0052571, currently in the custody of the Drug Enforcement Administration and 5th Judicial Drug Task Force (5th JDTF), as described in Attachment A.

6. As set forth herein, there is probable cause to believe there exists evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. §§ 1956(a)(1) and 1956(h).

7. The facts provided in this affidavit are based in part on information provided by a confidential source; other law enforcement agencies; on business records; on information gained through government and open-source searches; on recorded jail telephone conversations, cord ordered intercepted wire and electronic communications, on other information noted herein, and on my experience and background as a DEA TFO. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. This affidavit is based on my personal knowledge and participation in this investigation, as well as through interviews and analysis of reports, both written and verbal, provided by other federal, state, and local law enforcement officers and employees during the course of their official duties and through the analysis of telephone toll information and other information within the investigation. On the basis of my personal participation, knowledge of

and familiarity with this investigation, and on the basis of other information, which I have reviewed and determined to be reliable.

9. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. §§ 1956(a)(1) and 1956(h); have been committed by David WELLS and others known and unknown. There is also probable cause to search the safe described in Attachment A for evidence of these crimes.

## CONFIDENTIAL SOURCES

10. Confidential Source 2 (CS-2) is a confidential source who has provided accurate, truthful, detailed, and reliable information to law enforcement officers with the Blount County Sheriff's Office and DEA. CS-2 has several minor driving and alcohol related misdemeanor charges but also has a burglary charge in 2001, battery charge in 2004, and a sale and delivery of Schedule II charge in 2012. CS-2 was also arrested in 2018 for sale and delivery of Schedule VI. CS-2 has been a documented confidential source for the DEA since March 20, 2018. Law enforcement officers have determined the information provided has been accurate, reliable, and truthful through independent investigation and corroboration, including the use of consensual recordings, physical surveillance, and knowledge previously acquired by law enforcement officers. I believe the information supplied by CS-2 is truthful, reliable, and accurate. CS-2 is cooperating with law enforcement in this investigation for potential consideration of criminal charges. No promises or guarantees of reduction or dismissals of criminal charges have been made to CS-2 in exchange for CS-2's cooperation.

11. Confidential Source 3 (CS-3) is a confidential source who has provided accurate, truthful, detailed, and reliable information to law enforcement officers with DEA. CS-3 has

6

misdemeanor charges for driving and narcotics related incidents. CS-3 has a violation of probation for theft over $1,000 in 2012 and another violation of probation for aggravated burglary in 2013. CS-3 has been a documented confidential source for the DEA since May 10, 2018. Law enforcement officers have determined the information provided has been accurate, reliable, and truthful through independent investigation and corroboration, physical surveillance, and knowledge previously acquired by law enforcement officers. I believe the information supplied by CS-3 is truthful, reliable, and accurate. CS-3 is cooperating with law enforcement in this investigation for potential consideration of criminal charges. No promises or guarantees of reduction or dismissals of criminal charges have been made to CS-3 in exchange for CS-3's cooperation.

## BACKGROUND OF THE INVESTIGATION

12. Since March 2017, the DEA, the 5th JDTF, and other area law enforcement agencies have conducted a joint investigation into a marijuana DTO that is based in several counties in the EDTN, to include Knox, Sevier, Blount, and Anderson. The investigation has revealed that David WELLS, a.k.a. "Jay" and others are involved in a marijuana distribution conspiracy. During the course of the investigation, law enforcement officers have identified telephone numbers used by WELLS and others to conduct marijuana transactions. This investigation has revealed WELLS acquires several hundred-pound quantities of marijuana from a Northern California source of supply (SOS) by driving across the country with a heavy-duty pickup truck that has dual wheels in the rear (dually truck) and camper.

13. Law enforcement debriefed CS-2 about the WELLS DTO. CS-2 stated that he had previously gone to California to assist WELLS in transporting marijuana back to Tennessee. Specifically, CS-2 and WELLS flew to California together while a male unknown to CS-2 drove

7

a dually truck pulling a camper to California. Upon arriving in California, CS-2 assisted with paying for the marijuana and loading the marijuana into the camper. CS-2 and WELLS then flew back to Tennessee. CS-2 stated that he had personally been on trips to California where he and WELLS purchased seven hundred pounds of marijuana, six hundred being for WELLS and one hundred being for CS-2. CS-2 estimated he made this trip with WELLS on three occasions with different amounts of marijuana being purchased each time. CS-2 advised law enforcement that WELLS was currently living on Cresthill Road, Louisville, Tennessee, and had two, six foot safes at his residence. CS-2 went further to say that WELLS stored marijuana at the residence. From my training, experience, and knowledge of this investigation, I believe that WELLS stores large amounts of marijuana at his residence located at 1216 Cresthill Drive, Louisville, Tennessee, until he (WELLS) can distribute out pound amounts of marijuana at a time.

## PROBABLE CAUSE

**American Security Products safe, identification number 0052571, currently in the custody of the Drug Enforcement Administration and the 5th Judicial Drug Task Fore:**

14. On May 5, 2018, CS-3 informed law enforcement that he and WELLS had made a trip to a residence located at 3139 Easy Street, Pigeon Forge, Tennessee. CS-3 advised law enforcement that it was the second residence on the right and was a two story house with white columns and had two garage doors on the left side of the residence. CS-3 stated that he and WELLS went inside the residence to a safe located in the garage. CS-3 stated that WELLS opened the safe and retrieved a black backpack. CS-3 stated that the CS and WELLS took $50,000 in bulk cash to pay for a down payment on a piece of property but that the bag contained another $200,000 according the WELLS. CS-3 advised law enforcement that there were several firearms including

8

pistols and rifles along with two additional backpacks inside the safe. CS-3 was unable to provide any information as to what was in the additional backpacks.

15. Law enforcement determined that the residence located at 3139 Easy Street, Pigeon Forge, Tennessee, is a property owned by Jeremy SCHMID. SCHMID currently resides directly across the street at 3136 Easy Street, Pigeon Forge, Tennessee. The utilities at 3139 Easy Street, Pigeon Forge, Tennessee are in SCHMID's wife's name, Misty Schmid. Law enforcement officers provided CS-3 with a picture of 3139 Easy Street, Pigeon Forge, Tennessee. CS-3 advised law enforcement that the house in the picture was the house that CS-3 and WELLS went to. CS-3 confirmed that the house in the picture was the residence with the safe in the garage that contained bulk cash, firearms, and two additional backpacks. CS-3 also advised that SCHMID was a distributor of marijuana for the WELLS DTO.

16. On August 21, 2018, CS-3 informed law enforcement that WELLS had contacted him and was looking for a forklift so he (WELLS) could move his safes around. CS-3 also informed law enforcement that WELLS was also inquiring about locating waterproof 55-gallon drums. CS-3 stated that WELLS was also looking for industrial grade equipment for digging.

17. On August 25, 2018, utilizing a court-authorized pole camera, law enforcement observed an older model van pulling a trailer enter WELLS' driveway at 1216 Cresthill Drive, Louisville, Tennessee. Law enforcement noticed that on the trailer was a forklift. Law enforcement observed unknown individuals drive the forklift off of the trailer and back around the residence out of sight. Law enforcement attempted to initiate surveillance to identify the unknown individuals, but the van and trailer had already left the area.

18. On September 5, 2018, CS-3 informed law enforcement that WELLS had told him that he (WELLS) needed to get up to Jeremy's (SCHMID) house to "move out that safe." I asked

CS-3 if he remembered what the safe looked like. CS-3 stated that he couldn't really remember what the safe looked like but that it was big, a lighter color, and on a pallet.[1] Based on my training, experience, and knowledge of this investigation, I believe that WELLS was planning to move drug proceeds to hide it, possible bury it, in attempts to thwart law enforcement from being able to locate the bulk cash, guns, and marijuana.

19. On September 6, 2018, utilizing a court-authorized GPS tracking device on WELLS' 2016 Toyota Tundra, law enforcement observed WELLS on Easy Street at an approximate address of 3129 Easy Street, Pigeon Forge, Tennessee. The GPS tracking showed him at this location for one hour and 23 minutes.

20. On September 10, 2018, law enforcement executed a search warrant at WELLS' residence located at 1216 Cresthill Drive, Louisville, Tennessee. Law enforcement made contact with WELLS and after speaking with WELLS' lawyer and waiving his *Miranda* rights, WELLS agreed to speak with law enforcement. WELLS stated he has driven and flown to California to acquire marijuana that he resales in the Eastern District of Tennessee. WELLS stated that he would use a currier by the name of "Randy" to transport the money to California to pay for the marijuana and then bring the marijuana back to Tennessee. WELLS stated that he would pay Randy $30,000 in cash for each trip. WELLS stated that he has been doing this for over two years and would go to California approximately three to four times per year.

21. During the interview with WELLS, I asked about the two safes located in the basement of his residence. WELLS stated that one of the safes was open and empty and that the other safe had approximately one pound of marijuana inside of it. WELLS stated that he had close

---

[1] On September 10, 2018, agents observed a safe matching this description at Jeremy SCHMID's house located at 3139 Easy Street, Pigeon Forge, Tennessee.

to 200 pounds of marijuana inside the enclosed trailer for which law enforcement also had a search warrant. Law enforcement recovered approximately 171 pounds of marijuana from that trailer. A short time later, WELLS and I went to the basement where the safes were located. Once in the basement, I confirmed that one of the safes was open and empty. WELLS opened the second safe and approximately one pound of marijuana, MDMA, two boxes of shotgun shells, some jewelry, and bank information was found inside. I asked WELLS if he had any other safes and WELLS stated that he had two safes at his mattress store located off Lovell Road in Knoxville, Tennessee. WELLS stated that one of the safes had fallen over and could not be used, and that the other safe was empty. I asked WELLS if he had any other safes and WELLS stated he did not. I informed WELLS that his cooperation was important and that he should not keep anything from them and then asked him specifically if he had a safe located at Jeremy SCHMID's residence on Easy Street in Pigeon Forge, Tennessee. WELLS replied that he never had a safe up there and that there was not one there now. WELLS became agitated, put his hands over his face, and stated that he should not have listened to his lawyer and cooperated and that he shouldn't have said anything. At that point, WELLS refused to continue speaking with law enforcement. I explained to WELLS that since WELLS was a convicted felon, he was not allowed to possess ammunition.

22. Later that evening on September 10, 2018, law enforcement made contact with Misty Schmid at her residence located at 3136 Easy Street, Pigeon Forge, Tennessee. Misty stated that her husband Jeremy was out working and called him to return to the residence. A short time later, SCHMID arrived at the residence. Law enforcement asked SCHMID if he knew David WELLS and SCHMID stated that he was a client of his and somewhat a friend. Law enforcement asked SCHMID if he stored anything for WELLS at any of his businesses and/or residences. SCHMID stated that WELLS asked him if he could store a few things with him and SCHMID

11

agreed to it to help his client out. SCHMID walked law enforcement across the street to 3139 Easy Street (the same address that CS-3 positively identified in a photograph) and opened the garage. SCHMID pointed to a safe in the back of the garage and stated that the safe was the only item that wasn't there before WELLS dropped off what he wanted SCHMID to keep to store. SCHMID stated that WELLS moved the safe into that garage approximately a few years ago but couldn't remember exactly when WELLS moved it in. SCHMID stated that he had no idea what was in the safe or what the combination was. Law enforcement had SCHMID sign a consent form to seize the safe from the property. Law enforcement took custody of the safe and transported it to the 5th Judicial Drug Task Force where I maintained visual contact of the safe throughout the duration of the transport.

23. On September 11, 2018, a K-9 Sergeant with the Blount County Sheriff's Office had his K-9 walk around the safe at the 5th Judicial Drug Task Force. The K-9 made a positive alert on the safe.

## CONCLUSION

24. Based on the information contained in this affidavit, I request that there is probable cause to search the aforementioned safe in order to obtain evidence of illegal drug trafficking and proceeds. And it is further requested that the Court issue the proposed search warrant.

## REQUEST FOR SEALING

25. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of

12

Case 3:18-mj-02134-HBG   Document 2   Filed 09/18/18   Page 12 of 15   PageID #: 15

the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Zachary Standefer, Task Force Officer
Drug Enforcement Administration


Subscribed and sworn to before me on September 11, 2018.

_____
H. Bruce Guyton
UNITED STATES MAGISTRATE JUDGE

13

# ATTACHMENT A

Property to be searched

An American Security Products safe, identification number 0052571, currently in the custody of the Drug Enforcement Administration and the 5th Judicial Drug Task Force:



## ATTACHMENT B

### Description of Items to be Searched for and Seized:

Narcotics, firearms, ammunition, U.S. Currency; bookkeeping records (to include, receipts, schedules, tickets, notes, ledgers, and other documents relating to the transportation, ordering, purchasing, storage, and distribution of marijuana, to include keys to storage units); address books; financial records (including bank statements and records, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, wire transfer receipts and records, stocks, bonds, vehicle titles, and keys to safe deposit boxes) which evidence the obtaining, transferring, and concealment of the proceeds and assets associated with drug trafficking; photographs of drug customers and suppliers and other coconspirators; photographs of assets acquired from the sale of controlled substances; and mail, bills, and other documents which indicate dominion, ownership or control of the residence and vehicles.